UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

Case Number: 14-61564-CIV-MORENO

FEDERAL DEPOSIT INSURANCE
CORPORATION, as receiver for INDYMAC,
F.S.B.,,

        Plaintiff,

vs.

CHICAGO TITLE INSURANCE COMPANY,
a successor in interest of TICOR TITLE
INSURANCE COMPANY,

        Defendant.
_____/

### ORDER AFFIRMING MAGISTRATE'S REPORT AND RECOMMENDATION AND GRANTING SUMMARY JUDGMENT TO CHICAGO TITLE INSURANCE COMPANY

THIS MATTER is before the Court on the Federal Deposit Insurance Corporation's ("FDIC") Objection (D.E. 82) to the Magistrate's Report and Recommendation (D.E. 71) regarding Chicago Title Insurance Company's ("Chicago Title") and the FDIC's cross motions for summary judgment. The central issue is whether the FDIC failed to provide written notice to Chicago Title of an indemnity claim within 90 days of the discovery of facts giving rise to potential coverage, as required by the terms of the Closing Protection Letter signed by the parties' predecessor entities. Magistrate Judge John J. O'Sullivan concluded that the FDIC's written notice to Chicago Title was untimely, and recommended that summary judgment be granted to Chicago Title and denied to the FDIC. Because the undisputed record evidence demonstrates that the FDIC was in possession of facts revealing potential coverage under the Closing Protection Letter by May 2008 at the latest and that the FDIC did not provide written

notice to Chicago Title until June 13, 2014, the Court **AFFIRMS** Magistrate Judge O'Sullivan's Report and Recommendation.

I.     **FACTUAL AND PROCEDURAL BACKGROUND**

The FDIC, as receiver of IndyMac Bank ("IndyMac"), filed this lawsuit to recover losses stemming from the alleged breach of a Closing Protection Letter issued to IndyMac by Chicago Title's predecessor in interest, Ticor Title Insurance Company ("Ticor Title").[1] *See generally* Second Am. Compl. (D.E. 27).

On August 21, 2007, IndyMac made two mortgage loans to Maria Segal totaling $855,000 so that she could purchase real property in Fort Myers, Florida (the "Property"): one in the amount of $675,000 and the other in the amount of $180,000 (collectively, the "Segal Loans"). Def.'s Statement of Facts ("Def.'s SOF") at ¶ 3 (D.E. 45). Before it funded the Segal Loans, IndyMac received a title commitment from Ticor Title and its closing agent, Florida State Title, Inc. ("Florida State Title"), showing that two mortgages encumbered the Property—a $421,190 mortgage to Lehman Brothers Bank and a *$70,000 mortgage* to Fifth Third Bank, Florida. Def.'s SOF at ¶ 4. IndyMac also received draft HUD-1 closing statements for each mortgage from Florida State Title. *Id.* The closing statement on the $675,000 loan showed that Ms. Segal would be paying $41,611.04 at closing, and that $423,000 would be used to pay off a first mortgage on the Property and *$193,000 would be used to pay off a second mortgage* on the Property. *Id.* Chicago Title admits that the payment of $193,000 to satisfy a second mortgagee was inconsistent with the title commitment.[2] *Id.*

---

[1]     Ticor Title merged with Chicago Title on July 1, 2010.

[2]     The FDIC disputes that $193,000 was used to pay off a second mortgage and instead, asserts that Florida State Title disbursed the amount to JR Financial Holdings, LLC, a third party with no valid lien or right to the funds. Pl.'s Resp. to Def.'s SOF at ¶ 4.

2

In connection with the Segal Loans, IndyMac purchased from Ticor Title two title insurance policies guaranteeing against certain defects in title to the Property. Def.'s SOF at ¶ 5. Ticor Title also issued a Closing Protection Letter indemnifying IndyMac against certain defalcations by Florida State Title. *Id.* The Closing Protection Letter provided, in pertinent part:

> When title insurance of [Ticor Title] is specified for your protection in connection with closings of real estate transactions in which you are to be . . . a lender secured by a mortgage (including any security instrument) of an interest in land, [Ticor Title], subject to the Conditions and Exclusions set forth below, hereby agrees to reimburse you for *actual loss* incurred by you in connection with such closing when conducted by [Florida State Title] . . . when such loss arises out of:
>
> 1. *Failing of [Florida State Title] . . . to comply with your written closing instructions* to the extent that they relate to (a) the status of the title to said interest in land or the validity, enforceability and priority of the lien of said mortgage on said interest in land, including the obtaining of documents and the disbursement of funds necessary to establish such status of title or lien, or (b) the obtaining of any other document, specifically required by you . . . , or (c) the collection and payment of funds due you, or
>
> 2. *Fraud or dishonesty* of [Florida State Title] . . . in handling your funds or documents in connection with such closing.

Ex. 11 to Def.'s SOF (D.E. 45-12) (emphasis added).

The letter also provided, in its "Conditions and Conclusions" as follows:

> D. Claims of loss shall be made promptly to [Ticor Title] at its principal office. . . . When the failure to give prompt notice shall prejudice [Ticor Title], then liability of [Ticor Title] hereunder shall be reduced to the extent of such prejudice. [Ticor Title] *shall not be liable hereunder unless notice of loss in writing is received by the Company within ninety (90) days from the date of discovery of such loss.*

*Id.* (emphasis added).

In the closing instructions for the Segal Loans, IndyMac instructed Florida State Title *inter alia* to close the Segal Loans only upon receipt of certain documents, to disclose any suspicions of fraud, and to report to it secondary financing and payees not disclosed in the closing instructions, loan application, and/or Form HUD-1. Def.'s SOF at ¶ 8. The closing instructions also required that the funds received from IndyMac be disbursed in accordance with IndyMac's instructions. *Id.*

Ms. Segal defaulted on her loans without making a single payment. Def.'s SOF at ¶ 9. On December, 19, 2007, less than four months after the closing, Ms. Segal's attorney, Bonnie Canty, called IndyMac and stated that the loans were "fraudulent." *Id.*; Ex. 15 to Def.'s SOF at 1–2 (D.E. 45-16). On February 2, 2008, Ms. Segal called IndyMac to explain that the transaction was fraudulent and that the Property was bought in her name by someone who had offered her money to participate in the transaction. Def.'s SOF at ¶ 10; Ex. 15 to Def.'s SOF at 1–2. On February 5, 2008, Ms. Segal told an IndyMac representative that the loan account was fraudulent and that an investor had used her credit and that she was told that the investor would be making the payments on the loans. *Id.* On February 7, 2008, Ms. Segal again told IndyMac that an investor had used her credit to buy the Property and that she was not aware that the investor had failed to pay the mortgage until recently. *Id.*

In addition, on May 22, 2008, IndyMac received a letter and accompanying documents from Anthony Rodriguez, another attorney for Ms. Segal. Def.'s SOF at ¶ 11. Among the accompanying documents was a February 21, 2008 letter from Ms. Segal to IndyMac stating that a broker convinced her to buy the Property "as an investment," that the broker said that "they" had a client who would rent the house, but that "[u]nfortunately nothing of what I was told by [the broker] was true." *Id.*; Ex. 16 to Def.'s SOF at 2 (D.E. 45-17). Mr. Rodriguez also

4

submitted Ms. Segal's 2005 and 2006 tax returns, which showed that she made $31,413.33 in 2005 and $43,407.22 in 2006, and not the $223,140.64 and $226,378.25 reflected on the Forms W-2 that she had submitted to IndyMac before the closing. Def.'s SOF at ¶¶ 2, 11; Ex. 16 to Def.'s SOF at 19–25.

The FDIC took over IndyMac in July 2008. IndyMac commenced a foreclosure action against Ms. Segal in 2008 and obtained a judgment of foreclosure on the Property in or about May 2011. Def.'s SOF at ¶ 13. In July 2011, IndyMac obtained an appraisal and a "broker's price opinion" of the Property, which estimated the Property's value to be $235,000 and $189,900, respectively. *Id.*; Ex. 22 and 23 to Def.'s SOF (D.E. 45-23 and 45-24). In September 2011, the Property was sold at a loss. Def.'s SOF at ¶ 13.

Finally, pursuant to its statutory powers as the Receiver of IndyMac,[3] the FDIC subpoenaed Florida State Title's bank records from Bank of America, which the FDIC received on April 3, 2014. Pl.'s Statement of Facts ("Pl.'s SOF") at ¶ 24 (D.E. 46). From these bank records, the FDIC claims that it learned that Florida State Title disbursed loan funds—in violation of IndyMac's closing instructions—to JR Financial Holdings, LLC, a third party with no valid lien or right to the funds. Pl.'s SOF at ¶ 26; Pl.'s Resp. to Def.'s SOF at ¶ 4. The FDIC also claims that it "learned of facts giving rise to entitlement of indemnification under the [Closing Protection Letter] . . . no sooner than when it received [the subpoenaed bank records]," i.e. April 3, 2014. Pl.'s SOF at ¶ 25. On June 13, 2014, the FDIC finally sent notice to Chicago Title of its potential claim under the Closing Protection Letter. Pl.'s SOF at ¶ 27.

The parties filed cross motions for summary judgment on June 4, 2015. *See* Def.'s Mot. Summ. J. (D.E. 44); Pl.'s Mot. Summ. J. (D.E. 47). Magistrate Judge O'Sullivan issued a Report

---

[3] As Receiver of IndyMac, the FDIC has the power to issue pre-litigation "administrative subpoenas." *See* 12 U.S.C. § 1818(n) and 12 U.S.C. 1821(d)(2)(I).

and Recommendation granting Chicago Title summary judgment and denying the FDIC summary judgment on August 5, 2015, on the grounds that the FDIC discovered facts revealing a covered claim and suffered an actual loss at least three years prior to notifying Chicago Title of its claim, in violation of the Closing Protection Letter's 90-day notice provision. *See* R. & R. (D.E. 71). The FDIC timely filed its Objection to the Magistrate's Report and Recommendation on August 24, 2015. *See* Pl.'s Obj. to Magistrate's R. & R. (D.E. 82).

## II. ANALYSIS OF PLAINTIFF'S OBJECTIONS TO THE REPORT AND RECOMMENDATION

Magistrate Judge O'Sullivan recommended granting summary judgment to Chicago Title because "IndyMac and the FDIC had notice of facts that revealed a [Closing Protection Letter] claim years before the FDIC sent the . . . claim letter to [Chicago Title] in June 2014." D.E. 71 at 16. The FDIC objects because it believes that none of the facts cited in the Report and Recommendation—taken individually or in conjunction with one another—establish that IndyMac and the FDIC suffered a "covered" loss to the degree of certainty necessary to trigger the 90-day notice requirement. D.E. 82 at 5. The central question before the Court, therefore, is as follows: How certain must a lender be that it has suffered a "covered" loss under a closing protection letter such that the 90-day notice requirement is triggered?

### A. The 90-Day Notice Requirement Is Triggered When the Lender Discovers Facts Giving Rise to *Potential* Coverage Under the Closing Protection Letter.

The Report and Recommendation correctly found that "[t]he [Closing Protection Letter] requires a claimant to give notice of an indemnity claim within 90 days of discovery of facts that reveal a claim." D.E. 71 at 11; *see also F.D.I.C. v. First Am. Title Ins. Co.*, 611 Fed. Appx. 522, 531 (11th Cir. 2015) ("*Property Transfer Appeal*") ("Therefore, the closing protection letters require the FDIC to provide written notice within ninety days of discovering facts that reveal a

6

claim."). It is also well-established that the 90-day notice requirement is triggered on the date when both (a) the lender has *knowledge of facts giving rise to a claim* covered by a closing protection letter and (b) the lender has *suffered an actual loss*. *F.D.I.C. v. Attorneys' Title Ins. Fund, Inc.*, 2014 WL 4384270, at *5 (S.D. Fla. Sept. 3, 2014) (Seitz, J.) ("*WaMu*") ("The phrase 'date of discovery of such loss' includes not only the date of discovery of actual loss, but also when the indemnitee has knowledge of specific facts giving rise to a claim covered by the [Closing Protection Letter]."). The parties agree that IndyMac and the FDIC suffered an actual loss in July 2011. *Compare* Def.'s SOF at ¶ 13, *with* Pl.'s Resp. to Def.'s SOF at 13. The question, therefore, is whether IndyMac knew of enough facts that revealed a claim as early as 2007 or 2008, or whether the FDIC discovered sufficient facts revealing a claim only when it subpoenaed Florida State Title's bank records in April 2014.

The answer lies in part on how the Court defines "knowledge of facts giving rise to a claim." The FDIC urges the Court to adopt a standard that triggers the 90-day notice provision only when the lender gains specific knowledge that "the closing agent failed to comply with [the lender's] closing instructions." D.E. 82 at 3. Chicago Title, on the other hand, argues that the notice provision is triggered when the lender discovers "facts giving rise to *potential* coverage." D.E. 91 at 4 (citing *F.D.I.C. v. Stewart Title Guar. Co.*, 2013 WL 1891307, at *6 (S.D. Fla. May 6, 2013) (King, J.) ("Therefore, the Court simply needs to determine whether the date at which discovery of both actual loss and the facts giving rise to *potential coverage* had taken place was within 90 days of the FDIC's . . . claim letter.") (emphasis added) and *F.D.I.C. v. Attorneys' Title Ins. Fund*, No 1:10-CV-21197-PCH, D.E. 164 at 11 (S.D. Fla. May 17, 2011) (Huck, J.) ("*IndyMac*") ("So long as the FDIC or its predecessor IndyMac had knowledge of specific acts

7

that *may trigger* [Closing Protection Letter] coverage . . . , it 'discovered' an actual loss within the meaning of the [Closing Protection Letter].") (emphasis added)).[4]

In support of its position, the FDIC relies on the Eleventh Circuit's decision *Property Transfer Appeal*. *See* D.E. 82 at 3–4. In that case, the Eleventh Circuit affirmed a district court finding that the FDIC gave timely notice to the title insurer because—like the FDIC claims here—it did not receive notice of a claim until it subpoenaed the closing agent's bank documents. *See Property Transfer Appeal*, 611 Fed. Appx. at 531. *Property Transfer Appeal*, however, is different from this case because the district court concluded (after a bench trial) that none of the FDIC's documents "contain[ed] a report of facts that reveal[ed] a claim under the closing protection letters." *Id.* Unlike in this case, the FDIC in *Property Transfer Appeal* did not have any of the following: (1) servicing notes of phone calls with the borrower during which the borrower alleged that the underlying loans were "fraudulent"; (2) letters from the borrower alleging that she had allowed an investor to use her credit to procure the loans; (3) tax returns from the borrower showing that the W-2s submitted by the borrower to the lender prior to closing vastly overstated the borrower's annual income; or (4) a major discrepancy between the value of a second mortgage on the title commitment and the amount paid to satisfy the second mortgage on the closing statements. The undisputed facts in this case are very different from the facts of *Property Transfer Appeal*.

Given this precedent, the appropriate standard appears to be one that triggers the notice provision when the lender discovers "facts giving rise to *potential* coverage." *Stewart Title*, 2013 WL 1891307, at *6. In *WaMu*, for example, the district court granted summary judgment

---

[4] Notably, the Eleventh Circuit cites with approval the "potential coverage" and "may trigger" language from *Stewart Title* and *IndyMac* when it defines the standard that triggers notice in *Property Transfer Appeal*. *See* 611 Fed. Appx. at 531.

8

to the title insurer "on eight of the fourteen transactions on notice grounds" because the lender "*knew or should have known*" more than ninety days in advance of making its claim that (a) there was "an undisclosed second mortgage at closing" or (b) "the loss arose out of [the closing] agent's fraud or dishonesty." 2014 WL 4384270, at *6–7 (emphasis added). And in *IndyMac*, the court found that the lender's notice to the title insurer was untimely because—like here—"the Bank knew of misrepresentations that occurred in connection with the closing" and that the loan was made to a "straw borrower" and who was not making the "payments on the subject loans." No. 1:10-CV-21197-PCH, D.E. 164 at 2, 11.

There are good policy reasons for this rule. In many situations (including in this case), it takes years for lenders to acquire specific proof of a closing instruction violation. Thus, if a lender's obligation to provide notice to a title insurer of a claim is only triggered when the lender has specific proof of an actual closing instruction violation, then title insurers would remain unaware of potential claims, thereby defeating the purpose of a closing protection letter's timely notice provision.[5] Without timely notice, title insurers cannot take steps to investigate the potential claim—a job title insurers are more suited for than lenders anyway—and mitigate their potential loss. The appropriate standard to be applied, therefore, is whether IndyMac and the FDIC were in possession of facts giving rise to a potential claim under the Closing Protection Letter by May 2008.

### B. IndyMac and the FDIC Knew or Should Have Known of Facts Giving Rise to Potential Coverage by May 2008 at the Latest.

Given this standard, Magistrate Judge O'Sullivan concluded that "the record evidence reflects that IndyMac and the FDIC had notice of facts that revealed a [Closing Protection Letter]

---

[5] Such a rule would also incent lenders to put their heads in the sand anytime they receive information about a potential closing instruction violation, but have not uncovered the proverbial "smoking gun."

9

claim years before the FDIC sent the . . . claim letter to [Chicago Title] in June 2014." D.E. 71 at 16. Magistrate Judge O'Sullivan found that the following facts—which the FDIC does not dispute—triggered notice:

> 1) The draft HUD-1 closing statements showed that Ms. Segal would be paying $41,611.04 at closing and that $423,000 would be used to pay off a first mortgage on the Property and $193,000 would be used to pay off a second mortgage on the Property. Before it funded the Segal Loans, IndyMac received a title commitment that showed two mortgages encumbered the Property: a $421,190 mortgage to Lehman Brothers Bank and a $70,000 mortgage to Fifth Third Bank.
>
> 2) Ms. Segal defaulted on the loans without making a single payment.
>
> 3) Less than four months after the closing, on December 19, 2007, Bonnie Canty, a lawyer for Ms. Segal called IndyMac and stated that the Loans were "fraudulent."
>
> 4) On February 2, 2008, Ms. Segal called IndyMac to explain that the transaction was fraudulent and that the Property was bought in her name by someone else who offered her money to participate in the transaction.
>
> 5) On February 5, 2008, an IndyMac representative called Ms. Segal and again, Ms. Segal told the IndyMac representative that the loan account was fraudulent and that an investor used her credit and that she was told that the investor would be making payments on the Loans.
>
> 6) On February 7, 2008, Ms. Segal told IndyMac that she had used her credit to allow an investor to buy the house and was not aware that the investor had failed to pay the mortgage until recently.
>
> 7) Ms. Segal's lawyer, Anthony Rodriguez, sent a letter to IndyMac on or about May 22, 2008, which enclosed copies of Ms. Segal's tax returns for 2005 and 2006, which showed that she made $31,413.33 and $43,407.22 in 2005 and 2006, respectively, not the $223,140.64 and $226,378.25 reflected on the Forms W-2 she had submitted to IndyMac before the closing.

10

>   8) In 2008, IndyMac commenced a foreclosure action on the Property. In July 2008, the FDIC became IndyMac's receiver. In May 2011, IndyMac obtained an In Rem Final Judgment of Foreclosure against Ms. Segal and the Property.
>
>   9) In July 2011, the FDIC received appraisals for the Property that were well below the value of the Loans.
>
>   10) In September 2011, the Property was sold at a loss for $241,000.

See D.E. 71 at 16–18. The Court agrees with Magistrate Judge O'Sullivan, and finds that IndyMac, and by imputation the FDIC, were aware of potential closing instruction violations related to Ms. Segal's $41,611.04 cash-to-close payment and the $193,000 allegedly paid toward a second mortgage by May 2008 at the latest, thereby barring the FDIC's claim under the Closing Protection Letter as a matter of law for lack of timely notice.

The FDIC objects to Magistrate Judge O'Sullivan's interpretation of the facts vis-à-vis the notice requirement primarily on three grounds. First, as to the IndyMac's communications with Ms. Segal during the loan collection process, the FDIC argues that none of them "implicate . . . the closing agent . . . [or] establish a closing instruction violation." See D.E. 82-1. IndyMac's servicing notes, however, contain specific details of fraud—including details about how the fraud was perpetrated—not "vague statement[s]" of fraud. *WaMu*, 2014 WL 4384270, at *8, n.7. Ms. Segal's repeated communications with IndyMac alone should have put IndyMac on notice that something was awry with this loan transaction. But when the servicing notes are combined with the Ms. Segal's fraudulent W-2s and the discrepancy between the $70,000 Fifth Third Mortgage on the title commitment and the $193,000 payment reflected on the closing statements, these facts reveal that "Ms. Segal was a straw buyer who, in contravention of the Closing Instructions, did not pay $41,611.04 at the closing with her own money as reflected in the HUD-1." D.E. 71 at 18.

11

Second, the FDIC objects to the Report and Recommendation's "factual conclusion" that the facts regarding Ms. Segal's $41,611.04 "cash-to-close payment" revealed a closing instruction violation because the "cash-to-close payment appear[ed] to come from [Ms. Segal] herself" and "without more, there is no basis to conclude the closing agent violated the closing instructions." D.E. 82 at 7. The problem for the FDIC is that *there was more*, namely that Ms. Segal and her representatives repeatedly told IndyMac that *someone else* used Ms. Segal's credit to take out and close on the mortgage and that *someone else* was supposed to be making payment. In *WaMu*, the mere presence of an undisclosed second mortgage was enough to trigger the 90-day notice provision, even in the absence of direct evidence implicating the closing agent. *See* 2014 WL 4384270, at *6–7. Likewise, in this case, the mere knowledge that someone else used Ms. Segal's credit to obtain a loan—even if the "cash-to-close payment appear[ed] to come from Ms. Segal herself"—is enough to demonstrate a potential closing instruction violation. D.E. 82 at 7.

This Court also made clear in *WaMu* that there is no "scienter element [for] the failure to follow a closing instructions provision." 2014 WL 4384270, *7. As a result, if the funds used to make Ms. Segal's cash-to-close payment were not actually Ms. Segal's funds, then that is a closing instruction violation, regardless of whether the closing agent knew that the cash-to-close funds did not come from Ms. Segal. In its Second Amended Complaint, the FDIC alleged "upon information and belief" that "[Ms.] Segal received cash in the amount of $41,611.04 [from an undisclosed third party], which she deposited into her account at Bank of America, and then immediately used that very same cash to purchase a cashier's check, in the same amount, payable to Florida State, which she used as her down payment in this transaction." Second Am. Compl. at ¶ 24. All of the facts upon which this allegation is based were known to IndyMac and

the FDIC by May 2008. Therefore, the Court finds as a matter of law that IndyMac and the FDIC were aware of a potential closing instruction violation related to the $41,611.04 "cash-to-close payment" by May 2008.

The FDIC's final objection is to Magistrate Judge O'Sullivan's conclusion that "notice was triggered" based on the "significance of th[e] discrepancy" between the $70,000 second mortgage from Fifth Third Bank reflected on the title commitment and the $193,000 allegedly used to pay off a second mortgage that was reflected on the closing statements. D.E. 82 at 9; D.E. 71 at 18. The FDIC argues that given that the "Fifth Third Bank mortgage was an 'Open-Ended Mortgage,' which specifically includes 'future advances,'" it "would be possible, and even likely, that the amount required to pay off and clear the lien at closing would be more than the amount showed on the title commitment." Ex. A to Pl.'s Obj. to Magistrate's R. & R. (D.E. 82-1). Magistrate Judge O'Sullivan noted, however, that "the increase was more than double the estimated amount of $70,000 of the second mortgage reflected in the title commitment." Magistrate Judge O'Sullivan was being generous: the amount allegedly paid on the second mortgage represented a *275 percent* increase on the value of the Fifth Third Bank mortgage. This fact—especially when viewed in conjunction with the other facts known to IndyMac in late 2007 and early 2008—should have put IndyMac on notice that the $193,000 was likely not used to pay off the $70,000 Fifth Third Bank Mortgage. D.E. 71 at 18. Under these circumstances, the Court finds as a matter of law that IndyMac and the FDIC knew or should have known of a potential closing instruction violation related to the $193,000 payment toward the second mortgage by May 2008 at the latest.

### III. CONCLUSION

Because IndyMac, and by imputation the FDIC, was aware of a potential claim under the Closing Protection Letter by May 2008, and because it is undisputed that the FDIC suffered an actual loss in July 2011, the FDIC's June 13, 2014 written notice of its claim to Chicago Title was untimely under the Closing Protection Letter's 90-day notice provision. Therefore, it is

**ADJUDGED** that Magistrate Judge O'Sullivan's Report and Recommendation is **AFFIRMED**. Defendant Chicago Title Insurance Company's Motion for Summary Judgment (D.E. 44) is hereby **GRANTED**, and Plaintiff Federal Deposit Insurance Corporation's Motion for Summary Judgment (D.E. 47) is hereby **DENIED**. It is further

**ADJUDGED** that this case is **DISMISSED** and that all other pending motions are **DENIED AS MOOT**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this _____ of October 2015.

_____
FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE

Copies furnished to:

The Honorable John J. O'Sullivan

Counsel of Record